**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HANS HEITMANN, Individually and on behalf of other similarly situated individual Chicago Police Officers, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>CITY OF CHICAGO, )<br><br>Defendant. ) | No. 04 C 3304<br>Consolidated with<br>No. 04 C 5712<br><br>Magistrate Judge Schenkier |

HANS HEITMANN, Individually and )
on behalf of other similarly situated )
individual Chicago Police Officers, )
)
        Plaintiffs, )
)
                     )       No. 04 C 3304
vs. )       Consolidated with
)       No. 04 C 5712
CITY OF CHICAGO, )
)       Magistrate Judge Schenkier
        Defendant. )
--------------------------------------------------- )
)
THOMAS LINNANE, Individually and )
on behalf of other similarly situated )
individuals, )
)
        Plaintiffs, )
)
vs. )
)
CITY OF CHICAGO, )
)
        Defendant. )

## MEMORANDUM OPINION AND ORDER

    This is a consolidated representative action brought by Hans Heitmann, a retired Chicago

Police Officer ("officer"), who filed an action on behalf of himself and other similarly situated active

and retired non-supervisory officers ("*Heitmann* plaintiffs") of the Chicago Police Department

("CPD"), and Thomas Linnane, on behalf of himself and similarly situated active and retired

members of the CPD who hold the ranks of sergeant, lieutenant, and captain ("*Linnane* plaintiffs").

This action has been filed against the City of Chicago alleging violations under the Fair Labor

Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* ("FLSA"). The *Heitmann* and *Linnane* cases were consolidated on November 4, 2004 (*Linnane* doc. # 7).[1]

Both parties have moved for summary judgment. For the reasons stated below, this Court grants in part and denies in part the plaintiffs' motion for summary judgment (doc.# 89), and grants in part and denies in part defendant's motion for summary judgment (doc.# 79).

## I.

We begin with the governing legal standards. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party, and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir. 1990).

To successfully oppose a motion for summary judgment, a party must identify facts that are both material and genuinely disputed. *Celotex,* 477 U.S. at 324. To be material, a fact must be able to affect the outcome under the substantive law governing the motion. *Insolia v. Philip Morris, Inc.,* 216 F.3d 596, 598-99 (7th Cir. 2000). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the

---

[1]Pursuant to 28 U.S.C. § 636(c) and by the consent of the parties, the *Heitmann* and *Linnane* cases have been assigned to this Court for all proceedings, including the entry of final judgment (*Heitmann* doc. ## 12-14; *Linnane* doc. ## 8-10). Jurisdiction over these actions is conferred on this Court by 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331 and 1337.

non-moving party cannot rely on the pleadings alone, but it must offer evidence to identify material facts which create a genuine issue for trial. *Id.* at 324; *Insolia,* 216 F.3d at 598. If the evidence offered in opposition to summary judgment is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson,* 477 U.S. at 249-50. As the Seventh Circuit has warned, "[a] party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Rationale De Credit Agricole v. CBI Indus. Inc.,* 90 F.3d 1264, 1270 (7th Cir. 1996) (citations omitted); *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001) (explaining that summary judgment "is the 'put up or shut up' moment in a lawsuit") (citations omitted).

A party opposing summary judgment who fails to offer evidence to rebut a statement of undisputed material fact that is set forth by the movant does so at his peril: "[a]ll material facts set forth in a statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(c), Local Rules of the United States District Court for the Northern District of Illinois. Our appeals court has repeatedly upheld the application of these rules as appropriate and necessary tools of case management. *Koszola v. Bd. of Edu. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004) ("we have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment") (citations omitted).

3

## II.

In its memorandum opposing plaintiffs' summary judgment motion (*Heitmann* doc. # 95), defendant moves to strike plaintiffs' memorandum in support of their summary judgment motion because it exceeds the 15-page limit set by the local rule (Def.'s SJ Opp. at 2). Defendant also moves to strike paragraphs 8, 15-16, 31-33, 35, 43-55, and 57 of plaintiffs' Local Rule 56.1 Statement (*Id.* at 13). Despite the lack of formality to defendant's motion to strike (which is not recommended for future practice in this Court), we consider below its merits.

### A.

We deny defendant's motion to strike plaintiffs' 23-page summary judgment memorandum. We note that while opposing that oversized filing, the City did not seek to strike plaintiffs' oversized 19-page memorandum in opposition to the City's motion to dismiss. In any event, although plaintiffs should have sought leave to file in excess of 15 pages, we would have granted plaintiffs leave to file their 23-page memorandum had they timely asked to do so. Thus, we will not strike the memorandum at this time.

### B.

As for defendant's motion to strike certain paragraphs of plaintiffs' statement of fact, the Court rules as follows. The objections to paragraph 8, on grounds that it is legal argument, and to paragraph 35, on the ground that it is argumentative, are overruled. Defendant's foundation objections to paragraphs 43, 47, 50, 53, and 55 are also overruled. The reports that plaintiffs rely on to support those fact statements were produced from records maintained by defendant. Although plaintiffs' summary judgment briefing may not have laid a proper foundation for admitting these documents into evidence at trial, Rule 56(e) does not require a plaintiff's evidence to be in a form

4

admissible at trial at the summary judgment stage; it simply needs to be evidence that can be offered in an admissible form at trial. *See Ty, Inc. v. MJC-A World of Quality, Inc.*, 93 C 3478, 1994 WL 36880, *7 n.3 (N.D.Ill., Feb. 8, 1994). *See also American Security Co. v. Hamilton Glass Co.*, 254 F.2d 889, 893 (7th Cir. 1958). Defendant has not suggested that its own reports would not qualify as business records, and we would question its ability to make that suggestion in good faith. As for the remainder of the objections advanced, the Court overrules them as moot because we do not rely on the facts asserted in those paragraphs to rule on the present motions.

## III.

The material and undisputed facts are as follows. Defendant, City of Chicago, a municipal corporation organized and existing under the laws of the State of Illinois, is or was the employer of all *Heitmann* and *Linnane* plaintiffs (*Heitmann* Complaint, Pls.'Exhibit 1, ¶ 8; Pls.' Exhibit 2, ¶ 5). The CPD is the operating law enforcement agency of the City of Chicago (*Heitmann* Complaint, Pls.' Exhibit 1, ¶ 8). The CPD is a quasi-military organization that employs a command structure (Defendant's Rule 56.1 Statement of Facts ("Def.'s 56.1 SOF") ¶ 12). From the top to bottom, the order of rank for sworn personnel is: (1) Superintendent of Police; (2) First Deputy Superintendent; (3) Deputy Superintendent; (4) Chief of the Detective Division, Chief of Organized Crime Division, and Chief of Staff; (5) Assistant Deputy Superintendent, Deputy Chief, General Counsel to the Superintendent, and Executive Assistant to the Superintendent; (6) Commander, Administrative Assistant to the Superintendent, Director, Coordinator, and Office of Professional Standards Chief Administrator; (7) Captain; (8) Lieutenant; (9) Sergeant; and (10) Police Officer. *Id.*

The CPD is organized into the Office of the Superintendent, the Office of the First Deputy Superintendent, and five bureaus consisting of the Bureau of Investigative Services, the Bureau of Patrol, the Bureau of Strategic Deployment, the Bureau of Crime Strategy and Accountability, and the Bureau of Administrative Services (Def.'s 56.1 SOF ¶ 6, ¶ 42). The Bureau of Patrol is divided into five Areas and the Central Control Group ("Central Control"), which covers 25 contiguous police districts within the City (Def.'s 56.1 SOF ¶ 9).

The CPD generates reports that, among other things, show the number of officers authorized by budget to work in a particular district and the number of officers actually assigned there (Plaintiffs' Rule 56.1 Statement of Material Facts ("Pls.' 56.1 SOF") ¶ 42). Since 2001, the CPD has operated with less than its budgeted number of personnel throughout the department, especially in the Patrol Division (Pls.' 56.1 SOF ¶ 56 (Killackey Dep., Exhibit 34, pp. 15, 16 92, 93; K. Januczyk[sic] Dep., Exhibit 32, pp. 46, 63-65, 70-73, 76-78; Kiss Dep., Exhibit 35, pp. 55-57; Maher Dep. Exhibit 37, pp. 34, 35; O'Neill Dep., Exhibit 40, pp. 71, 90, 108; Perry Dep., Exhibit 41, p. 38; Shields Dep., Exhibit 48, pp. 40-43; 56-61; Waldera Dep., Exhibit 49, pp. 18, 21, 23, 24)).[2]

The CPD reports also indicate during several "police periods" in 2004,[3] the majority of districts operated with fewer than the budgeted number of police officers, sergeants, lieutenants and captains. For example, the CPD's strength report on police officers for the "10th police period" of 2004 shows that 22 of the 25 police districts operated with fewer than the authorized number of police officers, with an aggregate shortfall of 8.04 percent fewer officers than authorized (Pls.' 56.1

---

[2]The City disputes that the CPD "allows" shortages of officers and supervisors, but acknowledges that the CPD has operated with less than the budgeted number of personnel since 2001 (Def.'s Resp. to Pls.' 56.1 SOF ¶ 56).

[3]"A police period is twenty-eight days, and there are thirteen police periods in a year" (Def.'s SOF ¶ 25).

SOF ¶¶ 43, 45 (Exhibit 16)).[4] The strength report on sergeants for the 11th police period of 2004 illustrates that 24 of the 25 police districts operated with fewer than the authorized number of sergeants (Pls.' 56.1 SOF ¶ 47 (Exhibit 17)).[5] The strength report on lieutenants for the 8th period of 2004 shows that 22 of the 25 districts operated with fewer than the authorized number of lieutenants (Pls.' 56.1 SOF ¶ 50 (Exhibit 18)).[6] The strength report on captains for the 8th period of 2004 shows that 20 of the 25 police districts operated with fewer than the authorized number of captains (Pls.' 56.1 SOF ¶ 53 (Exhibit 19)).[7]

Police districts also are referred to as units (Def.'s 56.1 SOF ¶ 10). Each unit is run by a commander who reports directly to the appropriate area deputy chief (Def.'s 56.1 SOF ¶ 14). Officers in each unit are assigned to work one of three shifts: the first watch, second watch, or the third watch (Def.'s 56.1 SOF ¶ 16). Each watch contains staggered, overlapping, eight hour shifts (Id.).

The CPD assigns a watch commander to each watch (Def.'s 56.1 SOF ¶ 18). Generally, watch commanders hold the rank of lieutenant or captain, but sergeants are allowed to serve as watch commanders in the specialized units (Pls.' 56.1 SOF ¶ 29). Watch commanders are responsible for

---

[4]The City disputes that plaintiffs' Exhibit 16, Strength Report by District – Police Officers (10th Period 2004), demonstrates a difference between the actual number of police officers in the 25 districts and the authorized strength, because plaintiffs did not define the 10th police period of 2004 (Def.'s Resp. to Pls.' SOF ¶ 43). This dispute is not material.

[5]The City disputes this statement because plaintiffs did not define the 11th police period for 2004. This dispute is not material.

[6]The City disputes this statement because plaintiffs did not define the 8th police period for 2004. This dispute is not material.

[7]The City disputes this statement because plaintiffs did not define the 8th police period for 2004. This dispute is not material.

managing, among other things, manpower needs on their watches (Def.'s 56.1 SOF ¶19), including making decisions on the number of officers who may take leaves of absence, medical leaves, military leaves, maternity leaves, bereavement leaves, furloughs, personal days, baby furlough days, compensatory time, and sick days, as well as officers injured on duty and other unanticipated emergencies (Def.'s SOF ¶ 22).

The City and the Fraternal Order of Police, Chicago Lodge No. 7 ("FOP") entered into a collective bargaining agreement ("CBA"), which governs the terms and conditions of employment of officers (Pls.' 56.1 SOF ¶ 6). The City and the Policemen's Benevolent & Protective Association of Illinois entered into a CBA to govern the terms and conditions of employment of supervisors (Pls.' 56.1 SOF ¶ 7).

The City uses compensatory time as an alternative method to compensate its police officers and supervisors for overtime hours that they work. The CBAs covering all *Heitmann* and *Linnane* plaintiffs define overtime as those hours actually worked in excess of the normal work day or the normal work week (Pls.' 56.1 SOF ¶ 10 (FOP CBA, Exhibit 5 § 20.1-20.2 p. 48), SOF ¶ 11, (Sergeants' CBA, Pls.' Exhibit 6, p. 39-40; Lieutenants' CBA, Pls.' Exhibit 7, p. 40; Captains' CBA, Pls.' Exhibit 8, p. 40)). There are two types of overtime: contractual and FLSA. Police officers and supervisors have the option of electing either pay or compensatory time, at the rate of time-and-one-half, for approved overtime hours worked in excess of 171 hours within a 28-day FLSA work period ("FLSA overtime"), up to a maximum of 480 hours (Pls.' 56.1 SOF ¶ 14). In contrast, overtime hours exceeding 160 hours but less than 172 hours for a 28-day work period ("contractual overtime") are paid at the members' base salary. FLSA overtime is paid at a higher rate than contractual

8

overtime (Pls.' 56.1 SOF ¶ 17). For supervisors, overtime will accrue in 15-minute increments as long as plaintiffs work at least eight minutes in a 15-minute period (Pls.' 56.1 SOF ¶ 6) (Sergeants' CBA, Pls.' Exhibit 6 p. 40; Lieutenants' CBA, Pls.' Exhibit 7, p. 40; Captains' CBA, Pls.' Exhibit 8, p. 40). Plaintiffs must be paid (and thus may not receive compensatory time) for all FLSA hours earned in excess of the maximum of 480 hours (Pls.' 56.1 SOF ¶ 16).

The City keeps separate accounts for FLSA overtime and contractual overtime (Pls.' 56.1 SOF ¶ 14). The CBAs do not specify the order in which FLSA overtime and contractual overtime are to be deducted from those accounts when plaintiffs use compensatory time. In practice, when plaintiffs have used compensatory time the City takes those hours first from plaintiffs' FLSA compensatory time balance, and it will not deduct any hours from plaintiffs' contractual compensatory time balances until there is no FLSA compensatory time available (Pls.' 56.1 SOF ¶¶ 18-20). When supervisors cash in accumulated compensatory time pursuant to Section 26.6 of their CBAs, the City first cashes in hours from the supervisors' FLSA compensatory time accounts, and will not take hours from their contractual compensatory time accounts until FLSA overtime hours are exhausted (Pls.' 56.1 SOF ¶ 21, 22).

The CPD General Order 94-05-02 ("General Order"), entitled "Payroll and Timekeeping-Overtime/Compensatory Time," governs the procedures regarding overtime authorization and compensatory time use (Pls.' 56.1 SOF ¶ 9, Exhibit 9, p. 14). The General Order provides that sworn members who wish to take compensatory time off are required to complete an Overtime/Compensatory Time Report ("time due slip") and to submit the "time due slips" to their watch commander/unit commanding officers (Pls.' SOF ¶ 23), at least 24 hours in advance except

9

in emergency situations. The General Order directs that persons seeking to use compensatory time must specify the dates they request to take off, and specify the amount of time off (in one hour increments) sought on each date (Pls.' SOF, Ex. 9, at 18).

Under the collective bargaining agreement governing supervisory personnel, requests for use of personal days, baby furlough days, and surplus vacation days take priority over requests to use compensatory time (Def.'s SOF ¶ 28). Under the CBA governing police officers, requests to extend authorized furloughs receive priority over requests to use compensatory time (*Id.*, ¶ 27). In considering competing requests for use of compensatory time, the City has implemented a practice for use of accumulated compensatory time on a first come, first serve ("FCFS") basis (Pls.' 56.1 SOF ¶ 26). The FCFS policy means that those officers who submit their time due slips seeking a particular time will be considered in the order that they submitted their requests; the watch commander then determines which compensatory time off ("CTO") requests will be granted and which requests will be denied (*Id.* ¶¶ 26-27).

Requests to use compensatory time are granted or denied primarily based on claimed "manpower" needs within the plaintiffs' districts or units (Pls.' SOF ¶ 27). Each year, the CPD issues a number of written directives that restrict the use of compensatory time on some days for certain holidays or events when greater manpower is required, such as New Year's Eve, July 3rd and 4th, the Puerto Rican Festival, Bud Billiken Day Parade, the Taste of Chicago, and war protests or other demonstrations (Pls.' 56.1 SOF ¶ 38); (Def.'s 56.1 SOF ¶ 43). For other dates, watch commanders are responsible for determining how much manpower is necessary to operate the watches that they oversee efficiently and safely (Def.'s Resp. To Pls.' SOF ¶ 28). The General Order

10

states that watch commanders may grant CTO requests that do not exceed 14 consecutive days at their discretion, so long as the CTO request is "consistent with unit needs" and does not "adversely affect Department Operations" (Pls.' SOF, Ex. 9, at 15).

The claimed reason for denying compensatory time requests typically is shortage of "manpower" within the plaintiffs' districts or units (Pls.' 56.1 SOF ¶ 27). Several sergeants have testified that they believed they could not take compensatory time off when they needed it due to this shortage (Pls.' Ex. 36, Koplitz Dep., pp. 63-67) (testifying that, although he did not make written or verbal requests for CTO, he kept track of 47 occasions between May 2004 and March 2006 when he believed it would be impossible to ask for time off, because he was the only 25th District sergeant on duty in his district); (Pls.' Ex. 31 D. Januszyk Dep., pp. 54-56, 66, Pls.' Exhibit 23, Pls.' 56.1 SOF ¶ 62) (testifying that he could not take CTO on at least 36 occasions between March 2000 and December 2002 when he was required to work a different watch because there was a shortage of sergeants). In fact, one sergeant testified that there were written statements in the years 2001 and 2002 that came from the Chief of Patrol's Office which said: "Don't bother requesting compensatory time because it will not be granted" and/or it "will be denied" (Pls.' Ex. 31, D. Januszyk Dep., pp. 53-54). This statement was kept in the "Commander Officer's Book" ("CO" Book) (*Id.*, p. 54).

There is no evidence that the City has established any consistent criteria or guidelines for watch commanders to use in exercising their discretion under the General Order to determine whether manpower needs preclude the use of compensatory time on a given date. To the contrary, there is evidence of significant variation in the approaches watch commanders take in considering CTO requests. The plaintiffs' undisputed testimony is that when multiple officers request CTO for

11

the same times, certain watch commanders have taken a more restrictive approach to granting requests and others have taken a more liberal approach (Def.'s Resp. To Pls.' SOF ¶ 30). Some plaintiffs' requests to take compensatory time off were denied just before the date requested (*see* Pl's 56.1 SOF ¶ 35). Some CTO requests that were granted initially were later rescinded, sometimes on the day before or day of the compensatory time request (Pls.' 56.1 SOF ¶ 36-37) (O'Neill's Dep., Exhibit 40, pp. 36-39, 52-53) (Lt. O'Neill testified that on 5 or 6 occasions within a 5 month period of time, he was assigned to work the midnight watch in the 1st District when his compensatory time was cancelled at the last minute by his captain, who did not like working the midnight shift and who called him and told him, "You got time due tonight, but I'm not coming in. So you have to be there"). There is undisputed testimony that one captain said several times that he did not believe probationary officers should take any compensatory time because they needed to "be there for the training." (Def.'s Resp. to Pls.' SOF ¶ 59).

Before the City denies a police officer's request for compensatory time off, the City generally does not make an effort to obtain a replacement officer from other watches or from other units or districts (Pls.' 56.1 SOF ¶ 65). Watch commanders are not authorized to offer or pay overtime to any replacements to allow plaintiffs to take compensatory time off (Pls.' SOF ¶ 70). Thus, no efforts are made to find replacements when such replacements would require payment of overtime to the replacement officers or supervisors (Pls.' 56.1 SOF ¶ 69) (D. Januszyk Dep., Exhibit 31, pp. 64-65; Jones Dep., Exhibit 33, pp. 146-47; Kiss Dep., Exhibit 35, pp. 108-09; Maher Dep., Exhibit 37, pp.

12

18-19; Micek Dep., Exhibit 39, pp. 96, 119; Pohl Dep., Exhibit 43, p. 85; Rodriguez Dep., Exhibit 46, p. 37; Rosebrock Dep., Exhibit 47, pp. 41, 57).[8]

The City takes a somewhat different approach regarding supervisory and watch commanders' requests for compensatory time (Pls.' 56.1 SOF ¶ 67). The City will allow replacement supervisors to cover watch commander's positions in order for watch commanders to use their compensatory time (Pls.' SOF ¶ 68).

The evidence in the summary judgment record does not establish that the City maintains a policy or standard practice of offering police personnel alternative dates when a CTO request for a certain date is denied. The General Order does not direct watch commanders to offer alternative dates, and is silent on whether watch commanders must, may or cannot do so. There is evidence that some watch commanders offer alternative dates (*see* Def.'s SOF: Ex. 9, Anderson Aff. ¶ 8; Ex. 12, Rosebrock Aff. ¶ 8), but that others do not (*see* Pls.' SOF: Ex. 29, Brennan Dep. at 87-88; Ex. 45, Rios Dep. at 43). This conflicting evidence is consistent with the undisputed fact that the General Order gives watch commanders broad discretion in deciding whether to grant CTO requests (Def.'s SOF ¶ 34). What also is undisputed is that when CTO requests are denied, they are returned to the requesting officer – the City does not keep a copy of the request (Pls.' SOF ¶ 25). Nor does the City keep a record of the reason for a denial, or a record of any alternative date offered to the requesting officer. Again, the General Order does not require that the City keep that information. As a result, the City does not maintain records that show the percentage of CTO requests that are denied, the specific reasons for denials, or how often alternative dates are offered.

---

[8]The City disputes this statement of fact, but the evidence the parties have offered persuades us that this purported dispute is not genuine.

13

Both parties have acknowledged that the CBAs do not contain any provisions that explain the meaning of the terms "reasonable period" or "unduly disrupt," which are terms that appear in 29 U.S.C. § 207(o)(5) of the FLSA in connection with compensatory time requests (Pls.' 56.1 SOF ¶ 8). As indicated above, the CBAs do not address whether the City shall first deduct used compensatory time from the FLSA compensatory time accounts or the contractual time accounts (*See* FOP CBA, Exhibit 5; Sergeants' CBA, Exhibit 6; Lieutenants' CBA, Exhibit 7; Captains' CBA, Exhibit 8). Nor does the CPD's General Order, which outlines the rules for accumulation and payment of CTO, spell out how those responsible for granting and denying CTO requests are supposed to discharge the responsibility consistent with the FLSA. To the contrary, the City has no written policy or procedure for watch commanders to consult when evaluating a request by a plaintiff to use his/her compensatory time, but rather leaves the matter to individual watch commanders' discretion (Pls.' SOF ¶ 73).[9]

## IV.

The FLSA, 29 U.S.C. § 207(o)(5), and this Court's interpretation of it, controls the outcome in this case. We thus begin our analysis with a review of the FLSA's history and purpose.

The FLSA was enacted in 1938 to address concerns regarding the payment of overtime compensation. The FLSA made it mandatory for hourly employees of private employers working in excess of 40 hours per week to be compensated for those excess hours at a rate of not less than one and one-half times their regular hourly wage. 29 U.S.C. § 207(a)(1). In 1966, this mandate was applied to public-sector employers on a limited basis, *see* Fair Labor Standards Amendments of

---

[9]The City disputes this statement of fact, but our review of the evidence persuades us that the dispute is not genuine.

1966, Pub.L.89-601, § 102(b), 80 Stat. 831 (extending FLSA to certain categories of state and local employees), and then more broadly, *see* Fair Labor Standards Amendments of 1974, Pub. L. 93-259, §§ 6(a)(1)-(2), 88 Stat. 58-59 (extending the FLSA to all state and local employees, save elected officials and their staffs). Rulings of the United States Supreme Court in 1976 and 1985 addressed the effect of these amendments on state and governmental units. *See National League of Cities v. Usery*, 426 U.S. 833 (1976) (holding the FLSA overtime provisions unconstitutional as applied to state and local government(s); *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985) (overruling *Usery*)).

In 1985, in the wake of *Garcia*, Congress amended the FLSA to address the financial hardships that the FLSA imposed upon states and their political subdivisions by requiring the payment of overtime compensation. The principal statutory accommodation was to authorize states and their political subdivisions to award compensatory time or leave "in lieu of overtime compensation." 29 U.S.C. § 207(o)(1).

The FLSA provides that hourly employees who work in excess of 40 hours per week must be compensated for the excess hours at a rate not less than one-and-a-half times their regular hourly wage. 29 U.S.C. §§ 207(a)(1), (o)(1); *see also Christensen v. Harris County,* 529 U.S. 576, 578-79 (2000). This requirement applies to public-sector employers within the states and their political subdivisions. *Christensen*, 529 U.S. at 579. However, pursuant to Section 207(o)(1), States and their political subdivisions are allowed the option of compensating employees by giving them time off work at a rate of one and one-half hours for every hour worked, instead of paying overtime. *See* 29 U.S.C. § 207(o)(1). "To provide this form of compensation, the employer must arrive at an

15

agreement or understanding with employees that compensatory time will be granted instead of cash compensation." *Christensen,* 529 U.S. at 579. *See also* 29 U.S.C. § 207(o)(2); 29 CFR § 553.23 (2007).

The FLSA regulates some aspects of accrual and use of compensatory time. For example, the FLSA caps the number of compensatory time hours that an employee may accrue at 480. After an employee reaches that maximum, the compensatory time option no longer is available: the employer must pay cash compensation for additional overtime hours worked. 29 U.S.C. § 207(o)(3)(A). In addition, the FLSA permits the employer at any time to cancel or "cash out" accrued compensatory time hours by paying the employee cash compensation for unused compensatory time. *Id.* at § 207(o)(3)(B); 29 CFR § 553.26(a). The FLSA also entitles the employee to cash payment for any accrued compensatory time remaining upon the termination of employment. *Id.* § 207(o)(4).

Especially material to this case are the provisions of the FLSA which govern the CPD's right to grant compensatory time off and those which govern the employees' right to use compensatory time they have earned. Section 207(o)(1)-(2) governs the public employer's right to grant compensatory time in lieu of paying for time worked:

> (1) Employees of a public agency . . . may receive in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.

> (2) A public agency may provide compensatory time under paragraph (1) only
> (A) pursuant to
> (i) applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees; or

(ii) in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before the performance of the work; . . .

Section 207(o)(5) governs the public employee's right to use compensatory time that has been awarded in lieu of cash payment for overtime work:

(5) An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency-
(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and
(B) who has requested use of such compensatory time,

shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

Federal courts interpreting the FLSA have stated that Congress intended the FLSA's overtime provisions "to create the incentive to hire more workers, not to overwork the existing workforce." *See, e.g., Beck v. City of Cleveland*, 390 F.3d 912, 921 (6th Cir. 2004) (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 423-24 (1945)). Moreover, the legislative history of Section 207(o) indicates that Congress did not intend that public employers use the compensatory time alternative both to avoid payment of overtime and to avoid adding personnel to meet its actual operational needs. Instead, Section 207(o) was designed to avoid situations where compensatory time is awarded for overtime but without the employer having a good faith basis to believe it could grant that CTO to the employee if he or she requested it "within a similar period" to the time when the overtime was actually worked. *See* House Report No. 99-331, 99th Cong. 1st Sess. 10, 23 (1985). *See also* Senate Report No. 99-159, 1985 U.S.C.C.A.N. 651, 660.

The Committee is very concerned that public employees in office with regular year-round functions, short staff, and steady demands will be urged to accrue many hours

17

of compensatory time and then encounter difficulty in being able to make beneficial use of the accumulated compensatory time. It is the committee's view that an employee should not be coerced to accept more compensatory time in lieu of overtime pay in a year than an employer realistically and in good faith expects to be able to grant to that employee if he or she requests it within a similar period. To do otherwise would permit public employers to enjoy the fruits of the overtime labor of employees without having to pay the overtime premium required by the Act. Clearly, compensatory time is not envisioned as a means to avoid overtime compensation. It is merely an alternative method of meeting that obligation.

House Report, *id.*

The Department of Labor ("DOL") has been charged by Congress with the implementation and enforcement of the FLSA, 29 U.S.C. §§ 202, 203, and it has promulgated regulations interpreting the terms of the statute. As to Section 207(o)(5), the DOL has promulgated 29 CFR § 553.25, and has issued other written statements interpreting that provision. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842 (1984), we must address two questions in deciding the impact of those DOL regulations and statements on our interpretation of Section 207(o)(5).

"First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43. Second, if the statute is ambiguous with respect to the specific issue, then the Court must look to the agency's regulation interpreting that statute. *Id.* at 843. Where Congress grants "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation[,] [the agency's] legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44. As for "[i]nterpretations

such as those in opinion letters . . . ." the Supreme Court has held that these statements "do not warrant *Chevron*-style deference," because they are not subject to public rulemaking procedures. *Christensen*, 529 U.S. at 587. However, the Supreme Court has made clear that these types of statements may nonetheless be important tools of statutory construction. "[W]hen the language of the regulation is ambiguous," *id.* at 588, an agency's interpretation of its own regulations, such as opinion letters, is "entitled to respect" insofar as it has the "power to persuade." *Christensen*, 529 U.S. at 587 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)).

## A.

With these principles in mind, we now turn to the statutory construction issues presented by the parties' motions for summary judgment. Plaintiffs assert that defendant has violated the FLSA, Section 207(o)(5). Plaintiffs' position is that the term "reasonable period" in Section 207(o)(5) means the time period from the date that the compensatory time is requested up until the specific dates requested to be taken as compensatory time (Pls.' Mem. at 3). Thus, according to plaintiffs, the City could grant CTO on a date prior to the specific date or dates sought (*e.g.*, the City could award CTO on July 10 if the officer made a request on July 5 to use CTO on July 15), but could not grant CTO on a date after the specific date or dates sought (*e.g.*, the City could not award CTO on July 16 if it was sought on July 15). Only if the employer can show that permitting the use of compensatory time during that time period would "unduly disrupt" the operations (*i.e.*, due to a shortage in staffing, not simply the financial policies against payment of overtime) should the employer be able to deny such a request (Pls.' Mem. at 3-4). To support this interpretation, plaintiffs cite to three sources outside the statutory text and the FLSA's legislative history: (1) the statute's

19

implementing regulations, Application of the Fair Labor Standards Act to Employees of State and Local Governments, 29 C.F.R. § 553 *et seq.* (esp. § 553.25), which the Department of Labor enacted in 1987, pursuant to formal notice and comment rulemaking ("Regulations"); (2) an opinion letter produced by the DOL's Wage and Hour Division in 1994, 1994 WL 1004861 ("Opinion Letter"); and (3) an amicus brief filed by the Secretary of Labor in *DeBraska v. City of Milwaukee,* 131 F.Supp.2d 1032 (E.D. Wis. 2000) ("Amicus Brief").

Defendant offers a dramatically different interpretation of Section 207(o)(5). Defendant argues that the term "reasonable period" refers to the time period between the date an employee makes a request and the date(s) when the City can reasonably grant the request; it does not require the City to grant compensatory time on the specific days the plaintiffs demand (Def.'s Mem. at 5-6). Moreover, according to the City, it need not even consider the specific date requested by the officer, and thus it may deny a request without determining whether granting CTO on the specific date requested would unduly disrupt the CPD's operations. The City not only says that the statute does not require honoring a specifically requested date, but also says that the statute places no outside date on when the request must be granted. The City's interpretation depends on the view that the statutory language is unambiguous, and thus does not permit consideration of the agency's interpretation of it in the regulations or elsewhere. To support this proposition, defendant cites to language from several different appellate courts which have interpreted the provision "reasonable period" as unambiguous. *See, e.g., Houston Police Officers' Union v. City of Houston,* 330 F.3d 298, 300 (5th Cir. 2003), *cert. denied,* 540 U.S. 879 (2003); *Mortensen v. County of Sacramento,* 368 F.3d 1082 (9th Cir. 2004). *Cf. Aiken v. City of Memphis,* 190 F.3d 753 (6th Cir. 1999) (interpreting

20

the "reasonable period" clause in Section 207(o)(5) in light of a collective bargaining agreement which specifically defined "the conditions under which an employee can take compensatory time off").

For the reasons that follow, the Court concludes that Section 207(o)(5) is ambiguous with respect to the terms "reasonable period" and "unduly disrupt." Construing Section 207(o)(5) with the aid of the DOL regulation and other DOL statements, we reject the City's interpretation of the terms "reasonable period" and "undue disruptions." While we do not agree with all aspects of plaintiffs' proffered interpretation of those terms, we do agree that Section 207(o)(5) requires an employer to grant the CTO requests of employees for the specific dates requested that are within a reasonable period of the time the request is made, unless the employer can show that granting the specific request would "unduly disrupt" the employer's operations. We explain below why this is our view.

**B.**

A statute is ambiguous when it is capable of being reasonably interpreted in two or more ways. *See Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835-36 (7th Cir. 2000) *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, TENTH EDITION, 36 (defining ambiguous as "capable of being understood in two or more possible senses or ways"). The Court concludes that the plain language of Section 207(o)(5) is ambiguous with respect to both disputed terms.

As for the term "reasonable period," the statute is clear about when the reasonable period starts (*i.e.*, when an employee "make[s] the request" to use compensatory time). But, there is no concomitant language that tells a court when the "reasonable period" ends. Indeed, even the City

21

acknowledges this point: while claiming that the statutory language is clear (Def.'s Mem. at 6), the City also concedes that "Section 207(o)(5) does not define 'reasonable period'" (*Id.*, at 9). Whenever a legislature uses the word "reasonable" in a statute, some ambiguity is all but inevitable when attempting to apply that elastic concept to concrete cases. Here, the preamble to the regulations and the legislative history confirm that Congress did not intend for the phrase "reasonable period" to have any fixed meaning. Yet, the statutory language is silent on what considerations an employer may use in determining the length of the "reasonable period." Similarly, the statutory language does not provide guidance on what sorts of factors would create "undue disrupt[ion]" sufficient to justify departure from the mandate to provide compensatory time off within a reasonable time of the request. Thus, at the outset, we reject defendant's position that Section 207(o)(5) is unambiguous regarding "congressional intent on when and how public employers must grant comp time requests" (Def.'s Mem. at 4).

Therefore, the Court must look first to the federal regulations interpreting the statute for guidance. The regulations that govern Section 207(o)(5) are found at 29 CFR § 553.25.

The regulations state, in relevant part:

**29 CFR 553.25. Conditions for use of compensatory time ("reasonable period," "unduly disrupt").**

(a) Section 7(o)(5) of the FLSA provides that any employee of a public agency who has accrued compensatory time and requested use of this compensatory time, **shall be permitted to use such time off within a "reasonable period" after making the request, if such use does not "unduly disrupt" the operations of the agency....**

(b) Compensatory time cannot be used as a means to avoid statutory overtime compensation. An employee has the right to use compensatory time earned and must not be coerced to accept more compensatory time than an employer can realistically

22

and in good faith expect to be able to grant within a reasonable period of his or her making a request for use of such time.

(c) Reasonable period.

(1) **Whether a request to use compensatory time has been granted within a "reasonable period" will be determined by considering the customary work practices within the agency based on the facts and circumstances in each case. Such practices include, but are not limited to (a) the normal schedule of work, (b) anticipated peak workloads based on past experience, (c) emergency requirements for staff and services, and (d) the availability of qualified substitute staff.**

(2) The use of compensatory time in lieu of cash payment for overtime must be pursuant to some form of agreement or understanding between the employer and the employee (or the representative of the employee) reached prior to the performance of the work. (See § 553.23). To the extent that the conditions under which an employee can take compensatory time off are contained in an agreement or understanding as defined in § 553.23, the terms of such agreement or understanding will govern the meaning of "reasonable period."

(d) Unduly disrupt. When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations. **Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off . . . .** For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability **to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.**

(Emphasis in bold added).

These regulations are entitled to controlling weight in this case unless they, too, are ambiguous. *See Chevron,* 467 U.S. at 843-44. In this case, the regulations shed substantial light on the meaning of the terms "reasonable period" and "unduly disrupt" as used in Section 207(o)(5). The regulation does not specifically define what will constitute a "reasonable period" in specific cases.

However, the regulation does list "some factors to consider, and it gives the parties some freedom to define the term in their collective bargaining agreement." *DeBraska*, 131 F. Supp.2d at 1035.

The reason for this fluid approach to the term "reasonable period" is explained in the preamble to Section 553.25, which states in relevant part:

> The Department believes the use of the term "reasonable" was intended to accommodate varying work practices based on the facts and circumstances of each case. Therefore, it is necessary that each situation be examined on a case by case basis to make a determination of "reasonable period" since no arbitrary rule could be applied in every situation.

And,

> ...for an agency to refuse an employee's request for compensatory time off, it must be clear that the granting of such compensatory time off must result in an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity. **The Department recognizes that situations may arise in which overtime may be required of one employee to permit another employee to use compensatory time off. However, such a situation, in and of itself, would not be sufficient for an employer to claim that it is unduly disruptive.**

(Emphasis in bold added).

The preamble thus reinforces the connection between the concepts of "reasonable period" and "unduly disrupt" in Section 207(o)(5). The factors that subsection (c) of the regulation identifies as relevant to determining whether a CTO request has been granted within a reasonable period (such as anticipated peak workloads, emergency requirements, availability of qualified substitute staff) plainly are relevant to determining, under subsection (d), whether granting a CTO request would unduly disrupt operations by imposing "an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity . . . without the employee's services." The regulation further provides guidance on what an employer may *not* assert as a basis for undue disruption: "mere

24

inconvenience," or the need to offer overtime payments to attract qualified substitute staff, will not suffice as a basis to deny a CTO request.

In this case, the CBAs do not define the term "reasonable period." Thus, we must resort to the regulatory interpretation of "reasonable period" and "unduly disrupt" to provide content to those terms.[10] The regulation states that for an employer to turn down an employee's CTO request, it must in good faith believe that granting it would impose an unreasonable burden "during the time requested." 29 C.F.R. § 553.25(d). We read that directive as applying to an employee's request to take a specific day off as compensatory time. The phrase "during the time requested" reasonably can only mean one thing: during the specific time the employee requested leave.

To the extent that one may find any ambiguity in the meaning of this regulation, it is dispelled by other DOL pronouncements on the subject which we may consider. *See, e.g., Christensen,* 529 U.S. at 588; *see also United States v. Mead Corp.,* 533 U.S. 218, 234 (2001) (agency opinions entitled to "deference whatever its form, given the [agency's] specialized experience and broader investigations and information"). In this case, we have a subsequent Opinion Letter issued in 1994, 1994 WL 100481, as well as the Amicus Brief filed in the more recent case of *DeBraska,* 131 F. Supp.2d at 1032. In both of those documents, the DOL indicated that "reasonable period" includes an obligation on the employee to give adequate notice if he/she wants to use compensatory time on a particular day. The concept of reasonable notice is helpful, since it highlights the respective burdens upon the parties. Using this framework, once the plaintiff makes

---

[10]As noted in *DeBraska,* the DOL's regulations give the parties freedom to define the term "reasonable period" (29 CFR § 553.25(c)(2)), but their definition cannot contradict § 207(o)(5). *See* 29 CFR 553.23. The regulations, however, do not grant parties any contractual freedom to define the statutory "undue disruption" standard. *See* 131 F. Supp.2d at 1037.

a request for CTO, if it is made with reasonable notice, then the burden shifts to the employer to either grant the request, or to show why granting it would be "unduly disruptive" considering the factors set forth in Section 553.25(d) (and not due to mere inconvenience or because paying overtime is necessary to attract a replacement). But, if the CTO request is without reasonable notice, then it is axiomatic that such a request would be unduly disruptive to operations if granted, and the employer need not satisfy that burden.

We find further support for this reading of Section 207(o)(5) in *Christensen*. While the Supreme Court in that case did not address the precise question presented here, the Supreme Court's method of interpreting Section 207(o)(5) squares with the approach we take here. In *Christensen*, the Supreme Court considered a county's policy requiring its employees to use their accrued compensatory leave so as to avoid paying its officers compensation for unused leave. The Supreme Court interpreted Section 207 (o)(5) and concluded that: "At bottom, we think the better reading of § 207(o)(5) is that it imposes a restriction upon an employer's efforts to *prohibit* the use of compensatory time **when employees request to do so**; that provision says nothing about restricting an employer's efforts to *require* employees to use compensatory time." 529 U.S. at 585 (bold emphasis added; other emphasis original). The *Christensen* court also stated that "§ 207(o)(5) is more properly read as a minimal guarantee that an employee will be able to make some use of compensatory time **when he requests to use it.** As such, the proper *expressio unius* inference is that an employer may not, at least in the absence of an agreement, deny an employee's request to use compensatory time for a reason other than that provided in § 207(o)(5)." 529 U.S. at 583 (bold emphasis added). Thus, in the absence of an agreement otherwise, we conclude that Section

26

207(o)(5) guarantees an employee the minimal right to use compensatory time "when he (or she) requests to use it," 529 U.S. at 583, unless granting the request would cause undue disruption.

## C.

In reaching this conclusion, we have considered the main authorities to the contrary cited by the City: *Houston Police Officers' Union v. City of Houston,* 330 F.3d 298, 300 (5th Cir.), *cert. denied*, 540 U.S. 879 (2003); *Mortensen v. County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004). In those cases, the courts held that the term "reasonable period" is not ambiguous, and means "a span of time" after the date the CTO request is made. Those courts thus held it was unnecessary to resort to the DOL materials to interpret the statute, and held – contrary to the DOL's interpretation – that a public employer need not honor an employee's request for CTO on a specific date without regard to whether granting the request would cause undue disruption.

With respect, we disagree with the reading of the statute adopted in *Houston* and *Mortensen*. At the threshold, as explained above, we cannot agree that the phrase "reasonable period" is unambiguous. In holding that a public employer may disregard an employee's request for CTO on a specific day, the *Houston* and *Mortensen* decisions do not explain why a specific date sought by an employee cannot ever be within a "reasonable period" from the date of the request. Even assuming that the *Houston* and *Mortensen* interpretation of the term "reasonable period" is plausible, it certainly is not the only plausible interpretation. Once there are multiple plausible interpretations of the term "reasonable period," ambiguity exists and we give deference to the DOL interpretations of that term found in the opinion letter and amicus brief so long as they are persuasive. And, we find that they are persuasive.

27

*Houston* and *Mortensen* reason that because the language of Section 207(o)(5) says CTO must be granted within a reasonable time of a request, but does not specifically state that an employee may request time off on a certain date, an employee is not statutorily empowered to seek time off on a specific date. *Houston*, 330 F.3d at 303; *Mortensen*, 368 F.3d at 1090. In so doing, those decisions apply the maxim "inclusio unius est exclusio" ("the inclusion of one is the exclusion of another"), BLACK'S LAW DICTIONARY (SPECIAL DELUXE 5ᵀᴴ ED.), in a way that we find contrary to *Christensen*. In *Christensen*, the Supreme Court rejected use of that maxim as a basis for depriving an employer of the right to require employees to use compensatory time (even when they did not request it) to avoid having to cash out unused time. By contrast, the *Houston* and *Mortensen* decisions used that maxim to expand the reasons for depriving an employee of the right to use of compensatory time. We do think that is what the Supreme Court envisioned when it held that absent a governing collective bargaining agreement, an employer may not deprive an employee of a request to use compensatory time "for a reason other than provided in § 207(o)(5)." *Christensen*, 529 U.S. at 583.

This leads to another point at which we depart from the *Houston* and *Mortensen* analysis: the significance of the "unduly disrupt" provision in Section 207(o)(5). In *Mortensen*, the court observed that Section 207(o)(5) of the FLSA strikes a balance between an employer's "obligation and exemption." 368 F.3d at 1089. We agree with that general observation. Public employers who choose to award employees compensatory time instead of paying them cash for their overtime work have an obligation to allow employees to use that compensatory time. That obligation is tempered by two statutory exceptions: that the employee's requested time off be within a reasonable period

28

after the request is made, and that the use of compensatory time on a certain date does not unduly disrupt operations. However, *Mortensen* (as did *Houston* before it) failed to apply the undue disruption analysis in considering whether an employer may deny an employee's request for CTO on a specific date. In doing so, *Mortensen* and *Houston* improperly altered the balance between obligation and exemption that Congress struck, and contrary to the holding in *Christensen,* authorized employers to deny a CTO request "for a reason other than provided in § 207(o)(5)."[11]

In support of its interpretation, *Houston* also points to a concern about the elimination of costs savings to a public employer if it has to pay people overtime to award CTO on specific dates. The Court does not find that concern persuasive for two reasons. *First,* the regulations say that financial concerns are not a legitimate basis to deny a request for compensatory time. *Second,* there is no evidence that awarding the specific dates requested would require paying replacements overtime more often than awarding time off on amorphous dates chosen by the City.

Finally, we find our interpretation of the statute to be the one most consistent with common sense. In the real world, people do not ask for time off in a vacuum. They ask for specific dates for specific reasons: such as a birthday, a wedding, a funeral, a party, or a vacation. People do not simply ask for a day off "sometime in the future" without caring about which day or days they take. On the flip side of that reality is the corollary need for the employer to have reasonable notice by the

---

[11]The City complains that requiring it to grant CTO requests made for specific dates would "lead to absurd results" (Def.'s Mem. at 8). The City hypothesizes that under the interpretation we adopt, if 20 employees on a shift all requested CTO for the same date, the employer "would *have* to grant their requests unless the employer could demonstrate that granting the requests would unduly disrupt its operations" (*Id.*) (emphasis in original). We agree that this is the result, but we do not find it absurd. This merely reflects the obligation and exemption balance struck by Congress, whereby a public employer is empowered to deny a request for compensatory time only where granting it would create undue disruption. If a particular request would cause undue disruption, the employer is authorized by statute to deny it. If the request would not cause undue disruption, on the other hand, the employer is required by statute to grant it. We see no statutory basis to relieve the City of its duty to engage in an undue disruption analysis.

29

employee of the dates the employee wants to take. For example, people who ask for a day off on the very day they want to take time run the very reasonable risk that such a request will be denied, because it was not presented with reasonable notice (*i.e.*, it did not allow the employer to find a replacement and/or make other plans that would not require use of the employee's retained services). Interpreting the "reasonable period" to include the specific date for which CTO accommodates both the employer's and employee's interests is sought.

Indeed, if the employer can simply hold the employee's request for CTO indefinitely past the specific dates requested (for some undefined "reasonable period"), then the employer never needs to show that its decision not to permit the employee to take the specific days requested was because those dates would "unduly disrupt" the employer's operations. If the employer does not have to show the employee that use of compensatory time on the specific dates requested would unduly disrupt its operations, then what does the employer have to show? We find that the *Houston* and *Mortensen* interpretation would effectively read the undue disruption analysis out of Section 207(o)(5), and thus decline to adopt the interpretations set forth in those decisions.

**D.**

To summarize, we conclude that Section 207(o)(5) is ambiguous with respect to the meaning of the terms "reasonable period" and "unduly disrupt" when applied to the question of when an employer can deny an employee's request to take compensatory time off on a specific date. We further conclude that where, as here, the collective bargaining agreement does not define a "reasonable period," an employer must grant the employee's request for compensatory time off on the specific date requested, unless the employer reasonably and in good faith determines that

30

granting the request on that date could unduly disrupt the employer's operations. That reasonable and good faith determination cannot be based on mere inconvenience, and the employer may not decline to seek out substitutes to keep staffing levels at acceptable quality and quantity solely for financial considerations. This interpretation is faithful to the statutory language of Section 207(o)(5), and to the DOL's interpretations of that statutory provision.

We now turn to the application of this interpretation to the factual record developed by the parties on summary judgment.

## V.

The summary judgment record establishes that CTO requests were made seeking to use compensatory time on specific dates and were denied by the City. The City does not contend that the requested CTO dates were too close in time to the date the requests were made. Nor does the City offer any evidence that granting the denied CTO requests for specific dates sought would have unduly disrupted operations. The City has not offered any evidence that it maintained a policy or practice of denying requests for CTO only when granting the requests would cause undue disruption, and it kept no records detailing the reasons for the denials of requests for CTO.[12]

Thus, it is not surprising that the City has pitched its defense, not on its compliance with the undue disruption standard for denying CTO requests, but rather on a statutory interpretation of the FLSA that would relieve the City of the need to do so. However, we have rejected that

---

[12]Indeed, the City did not keep any kind of record of the CTO requests (that is, the time due slips) that it denied, and returned denied time due slips to the requesting officers. As we hold below, this failure to keep records does not itself violate the FLSA (*see* pp. 35-38, *infra*). However, the City's failure to keep records concerning the number of CTO requests denied, and the reasons for their denial, has deprived the parties (and the Court) of evidence that has been useful to other courts considering FLSA compensatory time claims. *See DeBraska*, 131 F. Supp. 2d at 1033; *Beck*, 390 F.3d at 924.

31

interpretation, and we have interpreted the FLSA as requiring the City to grant requests to take CTO on specific dates unless granting the requests would unduly disrupt operations. Under our interpretation, the City's absence of proof regarding compliance with the undue disruption standard, without more, is sufficient to warrant summary judgment for plaintiffs. If the City had evidence of compliance with the undue disruption standard, the time to offer it was now, in response to a summary judgment motion. *Albiero*, 246 F.3d at 933 (summary judgment "is the 'put up or shut up' moment in a lawsuit").

That said, we add that summary judgment is warranted here not simply because of this absence of proof from the City, but based on affirmative evidence that the City's policies and practices failed to comply with the undue disruption standard. We point to several categories of evidence in particular.

*First*, the evidence shows that the City's practice is to grant CTO requests on a first come, first serve basis, and that requests are generally granted or denied based on "manpower needs" of a specific district or unit (Pls.' 56.1 SOF ¶ 27). However, the evidence also shows that the City fails to provide direction on how to apply the consideration of "manpower needs" within the statutory directive that CTO requests may be denied only when granting them would cause "undue disruption." One result of that lack of guidance is disparity in the standards that watch commanders use to decide CTO requests: some take a restrictive approach and others a more liberal approach. This results in arbitrary denials for reasons having nothing to do with undue hardship: such as, a denial at the last minute when a captain said he wanted the time off instead (Pls.' 56.1 SOF ¶ 37); the standard adopted by one captain that probationary officers should never take compensatory time

32

because they need time on the job for training (this statement appears in Def.'s Resp. to Pls.' SOF, at 24, and the written statement from the Chief of Patrol's Office that said: "Do not bother requesting compensatory time because it will not be granted" (Pl.'s SOF: D. Januszyk Dep., Ex. 31, pp. 53-54)). This evidence shows that the City has denied requests for reasons other than provided in Section 207(o)(5), contrary to the teaching of *Christensen*, 529 U.S. at 583.

*Second*, the evidence shows that the City does not have a policy or practice of ensuring that if a CTO request for a specific date is denied, then the requesting officer is offered an alternative date within a reasonable period of when he or she made the request. The evidence shows that alternative dates are sometimes, but not always, offered. That is consistent with the fact that the General Order does not direct watch commanders to offer alternative dates when they deny a CTO request. The FLSA requires the City to grant the use of CTO within a reasonable time of the request, unless doing so would cause undue disruption. When the City denies a CTO request for a certain date without offering alternatives, it does so without engaging in an undue disruption analysis as required by the FLSA, and fails to comply with the statute.[13]

*Third*, in deciding whether a police officer's CTO request should be honored, the City will not seek out a replacement officer to keep staffing at acceptable levels (although the City will allow replacements so that supervisors and watch commanders can use compensatory time) (Pls.' 56.1 SOF

---

[13] The City protests that "for the most part" it has granted CTO requests on specific dates sought, and when it failed to do so, it granted CTO on an alternative day close in time to the requested dates (Def.'s Mem. at 2, 9-10). We note that the City has deprived us of the "best evidence" to test this assertion by failing to keep records showing how many requests are denied, and where alternative dates were proposed instead.

That said, even assuming the City *granted* requests for CTO on specific dates "for the most part," that does not immunize the City's *denials* of CTO requests for reasons that do not meet the "undue disruption" standard. The undisputed evidence we have cited above persuades us that the policies and practices lead to denials of CTO requests for reasons other than specified in Section 207(o)(5), in contravention of *Christensen's* reading of the statute.

33

¶¶ 65, 67). Moreover, the City refuses to authorize the payment of overtime in order to induce officers to act as replacements (*id.*, ¶¶ 69-70). These practices are flatly contrary to the DOL regulations, which explain that the need to pay one employee overtime in order to allow another employee to use compensatory time is not sufficient to meet the undue disruption standard. 29 CFR 553.25 (preamble).

*Fourth*, there is evidence that the City regularly has assigned fewer personnel to the various units and districts than authorized by the budget (Pls.' 56.1 SOF ¶¶ 43, 45, 47, 50, 53, 56). Given that CTO requests are typically decided based on the undefined standard of "manpower needs," this chronic shortfall between budgeted and assigned personnel has laid the framework for denials of CTO requests without regard to the statutory undue hardship standard. That is particularly true when these factors are combined with the refusal to seek out replacements, or to pay them overtime, in order to grant a CTO request.

We do not presume to tell the City how many police personnel it must hire, or how to balance the challenging budgetary and public safety concerns that the City must confront. However, it is clear that the FLSA does not authorize the City to balance those challenging concerns on the backs of the police personnel, by awarding them compensatory time in lieu of cash payments for overtime work but then depriving them of the ability to use that compensatory time for reasons not permitted by the statute. The financial considerations that plainly underlie the City's refusal to pay overtime to find replacement officers so that CTO requests can be granted, and that well may underlie the

34

shortfall between assigned and budgeted personnel, are not a permissible basis to deprive plaintiffs of their statutory right to use the compensatory time that they earned by their overtime work.[14]

Based on the evidentiary record and our interpretation of the FLSA, we therefore grant summary judgment for plaintiffs as to the injunctive relief portions of the complaint challenging the City's practices in considering requests for CTO, and deny the City's cross-motion for summary judgment on that issue. Plaintiffs have proposed general injunctive remedies in broad strokes, but we find that further briefing and a status is necessary to discuss more specific proposals for going forward.

## VI.

The plaintiffs also seek summary judgment on their claim that the City violates Section 211(c) of the FLSA by only keeping records of approved time due slips, and returning those denied requests to the plaintiffs; the City also seeks summary judgment on this claim. The City challenges this claim, and also contends that the plaintiffs do not have the authority to enforce the recordkeeping provisions of the FLSA, because this authority is vested exclusively in the DOL. The Court agrees with the City's argument. For the reasons set forth below, the Court denies the plaintiffs' motion for summary judgment on this claim, and grants the City's summary judgment motion on this aspect of plaintiffs' claim.

---

[14]To the extent that the City's complement of police personnel is chronically insufficient to allow police to take compensatory time without creating undue disruption, perhaps the City must revisit its decision to award compensatory time in lieu of cash payments. *See* 29 CFR 553.25 (preamble) ("[W]here the problem of disruption of services to the public is persistent, compensatory time should not be the preferred method of compensation for overtime work").

35

## A.

Section 211 of the FLSA provides for employers' recordkeeping obligations, and the Administrator's[15] exclusive authority to bring injunctive actions to restrain recordkeeping practices in violation of the statute. Under Section 211 (c), every employer subject to the FLSA "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, . . . and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder." Where employers fail to comply with the recordkeeping requirements, Section 211 (a) provides that the Administrator shall initiate all injunctive proceedings pursuant to Section 217 to restrain violations of the FLSA. 29 U.S.C. § 211(a); *see Powell v. Florida*, 132 F.3d 677, 678 (1998).[16]

Pursuant to Section 211, it is the Administrator, not individual employees, who has the authority to bring injunctive actions concerning recordkeeping practices alleged to be in violation of the FLSA. Accordingly, the plaintiffs in this case do not have the standing to challenge the City's

---

[15]The "Administrator" is known as the Administrator of the Wage and Hour Division, which is created under the FLSA and under the direction of the Administrator. The Administrator shall be appointed by the President, by and with the advice and consent of the Senate. 29 U.S.C. § 204.

[16]Section 217 grants the U.S. district courts jurisdiction to restrain violations of § 215.
"The district courts, together with the United States District Court for the District of the Canal zone, the District Court of the Virgin Islands, and the District Court of Guam shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215 (a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter . . ."

recordkeeping practices, or to request this Court to grant injunctive relief to order the City to maintain all time due slips.

## B.

Even if the plaintiffs had the authority to initiate injunctive proceedings under the FLSA, the Court finds that the City's recordkeeping practices – while, as noted above, are unwise – do not violate the specific recordkeeping requirements of the DOL regulation. The DOL regulation specifies the types of records that employers shall maintain for their employees for the purpose of complying with Section 207(o). Pursuant to 29 C.F.R. § 553.50, state agencies subject to Section 207(o) of the FLSA shall preserve records containing the basic information required by 29 C.F.R. § 516.2[17] and, in addition:

> (a) The number of hours of compensatory time earned pursuant to § 7(o) each workweek, or other applicable work period, by each employee at the rate of one and one-half hour for each overtime hour worked;

---

[17]Pursuant to 29 C.F.R. § 516.2(a), every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or both sections 6 and 7(a) of the Act apply:

(1) Name in full, as used for Social Security recordkeeping purposes,
(2) Home address, including zip code,
(3) Date of birth, if under 19,
(4) Sex and occupation in which employed,
(5) Time of day and day of week on which the employee's workweek begins,
(6) (i) Regular hourly rate of pay for any workweek in which overtime compensation is due under section 7(a) of the Act, (ii) explain basis of pay by indicating the monetary amount paid on a per hour, per day, per week, per piece, commission on sales, or other basis, and (iii) the amount and nature of each payment which, pursuant to section 7(e) of the Act, is excluded from the "regular rate" . . . ,
(7) Hours worked each workday and total hours worked each workweek . . . ,
(8) Total daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation,
(9) Total premium pay for overtime hours . . . ,
(10) Total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments . . . ,
(11) Total wages paid each pay period,
(12) Date of payment and the pay period covered by payment.

37

> (b) The number of hours of such compensatory time used each workweek, or other applicable work period, by each employee;
>
> (c) The number of hours of compensatory time compensated in cash, the total amount paid and the date of such payment; and
>
> (d) Any collective bargaining agreement or written understanding or agreement with respect to earning and using compensatory time off. If such agreement or understanding is not in writing, a record of its existence must be kept.

The CPD General Order provides that the time due slip shall consist of: (1) member information; (2) overtime earned; (3) reason for working overtime; (4) request to use compensatory time; (5) required explanation; (6) overtime authorized by; (7) request for compensatory time/payment; and (8) signatures (Pls.' SOF, Ex. 9, at 15-19). However, the time due slips do not contain the information or data set forth in Section 553.50. Therefore, plaintiffs have failed to fulfill their burden of proof to show that the City violates the recordkeeping requirements of the DOL regulation by returning those denied time due slips to the employees.

## VII.

The City also seeks summary judgment on plaintiffs' claim that the City has willfully violated the FLSA. Section 255 of the FLSA provides that the statute of limitation for any actions brought against employers for "*unpaid minimum wages, unpaid overtime compensation*, or *liquidated damages*" under the FLSA shall be extended from two (2) years to three (3) years, 29 U.S.C. § 255 (emphasis added). Although plaintiffs' complaints originally asserted damages claims,

38

plaintiffs have since abandoned any claims for monetary damages and are only seeking injunctive relief to bring the City into compliance with the FLSA.[18]

As a result, whether the City's violation of the FLSA was willful does not have any practical effect on the relief the Court will grant to the plaintiffs. Because a finding on the level of culpability of the City in its violation of the FLSA will not alter the outcome of the case, we see no reason to reach out to decide that issue. Thus, we deny the City's request for summary judgment on willfulness without deciding whether the City has shown that there is no genuine dispute of material fact that City's conduct was not willful.

## VIII.

Next, we address plaintiffs' assertion that the City's practice of first taking FLSA compensatory time from their time banks, rather than their contractual compensatory time, is improper. Plaintiffs did not assert this claim in their original or amended complaints as a violation of Section 207(o)(5), and thus they cannot raise it now on summary judgment. Moreover, plaintiffs offer no argument or authority that the FLSA requires contractual compensatory time to be used before FLSA compensatory time is used; nor do they claim the CBAs require that contractual and FLSA compensatory time to be used in any particular order. Thus, at bottom, plaintiffs ask us to rewrite the CBAs to include a benefit that they did not achieve at the bargaining table. We would decline to do so, even had plaintiffs asserted this claim in their complaints. Thus, we deny plaintiffs' motion for summary judgment on this assertion.

---

[18]Counsel for the *Heitmann* plaintiffs has acknowledged that his clients are not seeking monetary damages (Def.'s Ex. 49 (6/30/05 Transcript of Proceedings) at 3-4). Likewise, the *Linnane* plaintiffs are not seeking monetary damages (Pls.' Ex. 50 (2/21/06 Transcript of Proceedings) at 3).

## IX.

Finally, defendant also claims that some plaintiffs should be dismissed from the case because they have "not accrued FLSA comp time, have used their accrued comp time, or have not requested the use of such accrued comp time," and thus "are not entitled to do it" (Def.'s Mem. at 14). Defendant also seeks dismissal of two plaintiffs who have withdrawn from the litigation, and another plaintiff whom the City says abandoned his claims (*Id.*). The Court denies this request for the following reasons. *First*, the plaintiffs seek injunctive relief, not damages, and they proceed as a class, not as individuals. Thus, to the extent that they have withdrawn from the case, abandoned claims or no longer have compensatory time under the FLSA, it does not matter to our finding of liability or to the injunctive relief that will follow. And, irrespective of whether they remain parties, their testimony or other evidence of the City's policies and practices with regard to the administration and use of FLSA time is still relevant to show whether the City has violated 29 U.S.C. § 207(o)(5). *Second*, to the extent that certain plaintiffs have not accrued FLSA comp time, "have used their accrued comp time, or have not requested the use of such accrued comp time," these facts do not require their dismissal. The decision here is injunctive and applies to all persons who have, or could have, future FLSA comp time to use or to request.

## CONCLUSION

It is therefore ordered that the Clerk of the Court grant plaintiffs' motion for summary judgment (doc. # 89) as to injunctive relief only; in all other requests, the motion is denied. The defendant's motion for summary judgment (doc. # 79) is granted in part and denied in part. The

matter is set for status on October 4, 2007, at 9:00 a.m. Lead counsel shall attend that status conference and shall be prepared to discuss a procedure in determining appropriate injunctive relief consistent with this opinion. To facilitate that discussion, we order that lead counsel meet and confer on that subject by no later than September 28, 2007.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: September 11, 2007